# In the United States Court of Federal Claims

No. 11-790
Filed: December 30, 2011[1]
**TO BE PUBLISHED**

| | | |
|---|---|---|
| ************************************** | | |
| | * | |
| URS FEDERAL SERVICES, INC., | * | Post-Award Bid Protest; |
| | * | Competition In Contracting Act, 31 U.S.C. § |
| Plaintiff, | * | 3553; |
| | * | Override; |
| v. | * | 48 C.F.R. § 16.603-2(a). |
| | * | |
| UNITED STATES, | * | |
| | * | |
| Defendant, | * | |
| | * | |
| and | * | |
| | * | |
| VSE CORPORATION, INC., | * | |
| | * | |
| Defendant-Intervenor. | * | |
| | * | |
| ************************************** | | |

**Kevin P. Connelly, Joshua C. Drewitz, Kelly E. Buroker, Caroline A. Keller,** Seyfarth Shaw
LLP, Washington, D.C., Counsel for Plaintiffs.

**A. Bondurant Eley**, United States Department of Justice, Commercial Litigation Branch,
Washington, D.C., Counsel for the Defendant.

**Marcia G. Madsen, David F. Dowd, Luke P. Levasseur, Andrew A. Nicely, Polly A. Myers,**
Mayer Brown LLP, Washington, D.C., Counsel for Defendant-Intervenor

---

[1] On December 29, 2011, the court forwarded a sealed copy of this Memorandum
Opinion and Final Order to the parties to redact any information considered to be confidential
and/or privileged, and note any editorial errors requiring correction. The court has incorporated
the proposed redactions that the court deemed confidential or for which one of the parties
provided a sufficient basis to warrant confidential treatment. Therefore, portions of this
Memorandum Opinion and Final Order are redacted, as indicated by the notation "[redacted]."
This redacted version and a non-redacted version have been filed on this date with the Clerk of
the United States Court of Federal Claims.

**MEMORANDUM OPINION AND FINAL ORDER**

BRADEN, *Judge*.

I.  **STATEMENT OF FACTS.**[2]

The proposed scope of Contract No. TEOAF-12-D-001 is for "nationwide services for the receipt, possession, custody, management, and disposition of seized, blocked, or forfeited personal property on behalf of [the Department of Treasury's ("Treasury") Executive Office for Asset Forfeiture], the agencies participating in [the Treasury Forfeiture Fund] or [Office of Foreign Assets Control] when the seizing or blocking agency determines that Contractor services for such property will be in the agency's best interest." AR 96. The contractor was to be responsible for providing all services, materials, supplies, supervision, labor and equipment to perform such property management and disposition functions, including:

Pre-seizure analysis of General Property . . . .

The receipt, custody, security, transportation, review of Appraised Value . . . , quick sale, storage, inventory, preservation, maintenance, repair, modification, refurbishment, upgrade, and final disposition . . . of all types of General Property. . . .

Capturing, recording, reporting, and updating of all seizure data and related costs[.]

AR 96-97.

On July 17, 2009, Treasury issued a pre-solicitation notice via Federal Business Opportunities advising potential offerors that Treasury would be soliciting proposals for Contract No. TEOAF-12-D-001. AR 5. On January 20, 2010, Treasury issued a Solicitation. AR 5. The initial closing date was March 1, 2010, but Treasury subsequently issued a number of amendments extending the final bid closing date by over a year to May 25, 2011. AR 5.

On April 5, 2010, URS Federal Services, Inc. ("URS") submitted a proposal. Compl. ¶ 15. On January 28, 2011, Treasury made an initial competitive range determination that included URS as a competitive bidder. Compl. ¶ 16. On March 7, 2011, following discussions with Treasury, URS submitted a Final Proposal Revision. Compl. ¶ 16. In August 2011, Treasury decided to re-open discussions and URS submitted responses to follow-up questions during August 2011 - October 2011. Compl. ¶ 17.

Sometime in September 2010, VSE Corporation, Inc. ("VSE"), the incumbent, received a number of sole source extensions to continue performance of the existing contract TOS-11-C-001, during the extended Solicitation period. AR 91-92. These sole-source extensions cost Treasury $[redacted] per month or approximately $[redacted] million for the 13 month period. AR 13, 19, 26. The most recent extension, via Modification 007, was issued on September 29,

---

[2] The facts in this case were derived from the Administrative Record (AR 1-214) submitted under seal by the Defendant ("the Government") on December 5, 2011.

2011 and afforded Treasury two options: one option to extend the existing contract through October 31, 2011 and another to extend the contract through November 30, 2011.  AR 92. Treasury immediately exercised the first option, extending VSE's performance through October 31, 2011 at a cost of $3,038,138.25.  AR 92.

On October 28, 2011, Treasury awarded VSE Contract No. TEOAF-12-D-001 ("the Contract").  AR 5.  Treasury did not opt to exercise the second option under Modification 007 to extend the prior contract with VSE until November 30, 2011.  AR 92.  The cost of Contract No. TEOAF-12-D-001 appears to be $[redacted] over a 12-month base period, *i.e.* $[redacted] per month.  AR 13, 183.

On November 8, 2011, eight days after Treasury could have exercised the second option under Modification 007, to extend VSE's prior contract through the end of November, Treasury conducted a debriefing session with URS.  Compl. ¶ 9.  On November 14, 2011, URS filed a bid protest with GAO.  AR 5.  This act automatically stayed Treasury from proceeding with the Contract "while the [GAO] protest is pending," unless the "head of the procuring activity" authorized an override, pursuant to 31 U.S.C. § 3553(c)-(d) (2006).[3]

On November 22, 2011, Treasury issued a four-page "Determination & Findings" ("D&F") to justify issuing an override of the congressionally imposed automatic stay.  AR 5-8. Treasury's D&F concluded that the services to be performed under the Contract were "critical," and an override was justified, based upon three factors:

> [1.]    Seizures include, but are not limited to, perishable foods, tainted foods, dangerous food products, adulterated and unlicensed drugs, and unsafe consumer products. . . . [T]he risk of potentially contaminated goods entering the commerce of the United States would be significantly increased without the necessary contractor resources available during the seizure. . . .

> [2.]    [I]tems that are seized include weapons of mass destruction (stinger missiles), illegal firearms, rocket fuel destined for Iran, explosives, and hazardous substances.  The failure to properly process and handle these items is a major issue of public safety.  The Government does not have the resources available or the required licenses or permits necessary to properly seize, transport, store, and dispose of such dangerous assets.  In the event that a contractor is not available to provide these specialized skills, the Government would be forced to put Government employees as well as the general public at risk. . . .

---

[3] The Competition in Contracting Act, Pub. L. No. 98-369, Div. B, Title VII (1984), as amended, is codified, in relevant part, at 31 U.S.C. § 3553 ("CICA").

[3.]   [T]he contractor manages the storage for specialty assets, cars, vessels, aircraft and management of the Government warehouses [that house evidence in cases involving organized crime].  In the event that contractor resources are not available for the management and disposal of property stored within the Government warehouses, a significant and immediate backlog of property would be experienced, exceeding the capacity of the Government warehouse.  The lack of adequate and secure storage of bulk evidence to maintain its integrity could result in mistrials and dismissals of criminal, civil and administrative law violations, freeing violators to commit additional crimes against the Government and citizens of the United States. . . . Such a failure could also expose the Government to significant liability under the Federal Tort Claims Act.

AR 6.

Based on these findings, the Head of the Contracting Activity ("HCA") determined that "continued IDIQ contract and task order performance is in the best interest of the Government." AR 7.[4]

## II.     Procedural History.

On November 14, 2011, URS filed a bid protest with GAO.  AR 5.  On November 22, 2011, Treasury issued an override.  AR 5-8.  On November 23, 2011, URS filed a sealed Complaint For Declaratory Judgment, Temporary Restraining Order, And Preliminary And Permanent Injunctive Relief in the United States Court of Federal Claims ("Compl.").  The Complaint requests that the court determine that Treasury's November 22, 2011 override is "arbitrary and capricious and without a rational basis, and contrary to applicable law."  Compl. ¶ 27.  On the same day, URS also filed a Motion For Temporary Restraining Order and a Motion For Protective Order.

---

[4] On November 14, 2011, a draft of the D&F was prepared by the CO discussing Treasury's concerns that "to continue the services [with VSE] with a . . . bridge contract would leave the [G]overnment without services for at least [redacted] weeks while a sole source award is being procured."  AR 20.  This document *was not shown to the HCA*,

On November 22, 2011, the Contracting Officer ("CO") also apparently prepared a second document that provided further justification for the override, entitled Determination and Findings Supporting Documentation ("Supporting Memorandum").  AR 9-13.  The Supporting Memorandum provides a more detailed discussion of the three factors discussed in the D&F.  AR 9-13.  In addition, the Supporting Memorandum added a factor *not* discussed in the D&F, *i.e.*, performance by VSE under the October 28, 2011 Contract would save Treasury over $[redacted] million per month, instead of the price under which VSE previously was performing.  AR 13. ("[A]ny continuation of the sole source contract . . . would amount to economic waste.").  This document also was not shown to the HCA

On November 23, 2011, the court convened a telephone status conference, during which the court denied Plaintiff's Motion for a Temporary Restraining Order.

On November 28, 2011, VSE filed an Unopposed Motion To Intervene that was granted on November 29, 2011.

On December 2, 2011, the court issued a Scheduling Order providing for expedited briefing. The Government also filed A Motion For Protective Order And Response To Plaintiff's Motion For Protective Order and an Unopposed Motion To File Administrative Record Under Seal.

On December 5, 2011, the court granted the Government's December 2, 2011 Motion For Protective Order. Later that day, the Government filed the Administrative Record under seal. The Government also filed a sealed Motion to Supplement [The] Administrative Record With The [December 5, 2011] Declaration Of Jeffrey M. Jackson, the Contracting Officer, to explain Treasury's reasoning in issuing the November 22, 2011 override.[5]

On December 9, 2011, all parties filed Cross-Motions For Judgment On The Administrative Record ("Pl. Brief," "Gov't Br.," "Int. Br."). VSE also filed a Motion To Supplement The Administrative Record with the Declaration of Ms. Cathy S. Kilcoyne, VSE's Director of Contracts, to provide additional information regarding VSE's responsibilities under the current and former contracts.[6]

On December 16, 2011, all parties submitted Responses to the December 9, 2011 Cross-Motions ("Pl. Resp.," "Gov't Resp.," "Int. Resp.").

---

[5] The Jackson Declaration provides additional explanation why Treasury excluded certain arguments from the final D&F that the HCA was requested to approve. In addition, the Jackson Declaration discusses math errors made by Treasury in calculating the monthly cost of the prior sole source contract with VSE. Since this declaration was not provided to the HCA it is not relevant. Moreover, the Jackson Declaration is not necessary "to permit meaningful judicial review." *Axiom Res. Mgmt.* v. *United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009). Therefore, the court has declined to grant the Government's Motion To Supplement The Administrative Record with the Jackson Declaration.

[6] VSE's Motion To Supplement The Administrative Record is likewise denied, because the Kilcoyne Declaration was neither provided to Treasury nor is it necessary "to permit meaningful judicial review." *Axiom Res. Mgmt*, 564 F.3d at 1380.

## III.   DISCUSSION.

### A.  Jurisdiction.

The United States Court of Appeals for the Federal Circuit has held that 28 U.S.C. § 1491(b) authorizes the United States Court of Federal Claims to adjudicate challenges to an override issued pursuant to 31 U.S.C. § 3553. *See RAMCOR Servs. Group* v. *United States,* 185 F.3d 1286, 1290 (Fed. Cir. 1999) ("[T]his court determines that 28 U.S.C. § 1491(b)(1) grants the trial court jurisdiction over an objection to a violation of 31 U.S.C. § 3553(c)(2)."). The court's jurisdiction also extends to override determinations "premised upon asserted 'best interests of the United States' as well as those based upon asserted 'urgent and compelling circumstances that significantly affect interests of the United States.'" *Chapman Law Firm Co.* v. *United States,* 62 Fed. Cl. 464, 466 (2004) (quoting 31 U.S.C. § 3553(d)(3)(C)).

Congress has emphasized that "[i]n exercising jurisdiction [to review a federal agency's override], the courts shall give due regard to the interests of national defense and national security[.]" 28 U.S.C. § 1491(b)(3). Therefore, "where legitimate 'interests of national defense and national security' have been asserted and established to the court's satisfaction, it is 'not necessary' for the court to reach the merits of whether [the CICA] was violated." *Kropp Holdings, Inc. v. United States,* 63 Fed. Cl. 537, 549 (2005).

In this case, only Intervenor VSE contests the court's jurisdiction on national security grounds, arguing that the scope of the Contract allegedly involves securing "weapons of mass destruction (stinger missiles), illegal firearms, rocket fuel destined for Iran, explosives, and hazardous substances." Int. Br. at 4-8 (quoting AR 6). The D&F finding (AR6) on which VSE bases this argument), however, is materially different from the scope of the contract described in the Solicitation, that provides: "Out of scope property that should not be stored, and for which the Contractor shall not provide services, under the Contract include . . . controlled substances (i.e., drugs/narcotics, firearms, and Bureau of Alcohol, Tobacco, Firearms, and Explosives' classified Class A and B explosives). The custody of firearms will not be transferred to the Contractor." AR 96. The striking difference between the scope of the Contract described in the Solicitation and the D&F seriously undermines the basis on which Treasury issued the override.

Although the November 22, 2011 D&F cites "financial and safety risks" (AR 7) the November 22, 2011 D&F does not invoke "national defense and national security" as the basis for the override. *See* AR 4-8. Accordingly, the court has determined that it has jurisdiction to adjudicate URS's challenge to Treasury's November 22, 2011 override.

### B.  Standing

To establish standing in a bid protest case, an aggrieved bidder must be an "interested party."  *See* 28 U.S.C. § 1491(b)(1); *see also American Fed'n Gov't Employees, AFL-CIO v. United States,* 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("We hold that standing under [28 U.S.C.] § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").  URS has established that it is an "interested party," because it submitted a bid for the Contract.  Compl. ¶¶ 15-17.

A protestor also must show that the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc.* v. *United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." (internal quotation marks omitted)); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing.").  A party demonstrates prejudice when "it can show that but for the error, it would have had a substantial chance of securing the contract."  *Labatt,* 577 F.3d at 1378.  Importantly, a proper standing inquiry must not conflate the requirements of "direct economic interest" and prejudicial error.  *Id.* at 1380 (explaining that examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

The United States Court of Appeals for the Federal Circuit, however,  has not specifically addressed whether, in the context of a motion to set aside or enjoin an override of an automatic stay, issued under 31 U.S.C. § 3553(d)(3)(C), "prejudice" must be demonstrated to establish standing, *i.e.,* that the protestor would have a "substantial chance" of receiving the award absent the alleged error in the procurement process.  A reasonable interpretation of 31 U.S.C. § 3553(d)(3)(C), supports the proposition that establishing prejudice in an override case should not involve a higher standard than for the underlying bid protest.  *See Weeks Marine, Inc.* v. *United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009) (explaining that to establish standing a bidder must demonstrate a "non-trivial competitive injury which can be addressed by judicial relief." (internal quotation marks omitted)).

VSE, however, argues that URS does not have standing, because it has not shown that it suffered any "injury-in-fact," as required by the United States Supreme Court in *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Int. Resp. at 2-6.  URS's only claimed injury results from the November 22, 2011 override, *i.e.*, a competitive disadvantage even if the GAO were to rule in its favor, is too speculative to afford standing to challenge Treasury's November 22, 2011 override.

Although it is true that URS's injury-in-fact is limited to a competitive disadvantage, competitive injury repeatedly has been recognized as sufficient to support Article III standing. *See Association of Data Processing Serv. Orgs.* v. *Camp*, 397 U.S. 150, 152 (1970) (holding that

competitive injuries can establish standing under the *more* rigorous APA prudential standing doctrine); *see also Canadian Lumber Trade Alliance* v. *United States*, 517 F.3d 1319, 1334 (Fed. Cir. 2008) (observing that "in most 'competitor standing' cases . . . it is *presumed . . .* that a boon to some market participants is a detriment to their competitors."). Because competitive injury is not easy to quantify, Congress decided the proper remedy was the automatic stay, which is limited in nature. *See* H.R. Conf. Rep. No. 98-861 at 1435 (1984) ("[A] strong enforcement mechanism is necessary to insure that the mandate for competition is enforced.");[7] *see also Reilly's Wholesale Produce* v. *United States*, 73 Fed. Cl. 705, 717 (2006) ("Congress enacted the automatic stay on the premise that the failure of an agency to stay performance could result in a competitive disadvantage that might not be remedied, causing a contractor to lose an important business opportunity."). As the United States Supreme Court has held, "'Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.'" *Massachusetts* v. *EPA*, 549 U.S. 497, 516 (2007) (*quoting Lujan*, 504 U.S. at 580 (Kennedy, J. concurring)). If, however, the court accepted VSE's argument, it would mean that an unsuccessful bidder would *never* have standing to challenge an override, unless it was an incumbent. This would be contrary to Congress' decision to impose an automatic stay as a temporary remedy, until the merits of a bid protest can be reviewed by the GAO in the first instance. The November 23, 2011 Complaint in this case alleges a sufficient factual basis for the court to determine whether URS had a "substantial chance" of being awarded the Contract. In fact, URS's bid was deemed sufficiently competitive that Treasury decided to reopen discussions six months after URS submitted its Final Proposal Revision. Compl. ¶¶ 16-17.

For these reasons, the court has determined that URS has standing to challenge Treasury's November 22, 2011 override.

### C.  Standard For Review.

The court is required to review the substantive merits of an override decision, pursuant to the standards set forth in the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A). *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection [*i.e.* in connection with a bid protest], the courts shall review the agency's decision pursuant to the standards set for in section 706 of title 5."). In *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* 401 U.S. 402 (1971), the United States Supreme Court held:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make

---

[7] Another congressional report issued a year after the CICA was enacted further explained that prior to imposing an automatic stay "[a]gencies . . . often proceeded with their contracts, simply ignoring the protest process. As a result, vendors were confronted with a *fait accompli* and often did not receive fair and equitable relief even when GAO decided in their favor." H.R. Rep. No. 99-138 at 5 (1985)."

this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Id.* at 416.

Subsequently, the United States Supreme Court explained in *Motor Vehicle Mfrs. Ass'n of the United States* v. *State Farm Ins. Co.,* 463 U.S. 29 (1983), that "an agency rule would be arbitrary and capricious[,] if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43. In applying these standards to a CICA override, the United States Court of Federal Claims has determined that an agency must address four issues:

(i) whether significant adverse consequences will necessarily occur if the stay is not overridden . . .

(ii) conversely, whether reasonable alternatives to the override exist that would adequately address the circumstances presented . . .

(iii) how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs . . .

(iv) the impact of the override on competition and the integrity of the procurement system, as reflected in the Competition in Contracting Act[.]

*Reilly's Wholesale*, 73 Fed. Cl. at 711 (internal citations omitted).

The Government argues that the court should ignore *Reilly*, because "[t]his Court is not empowered to identify factors that a Federal agency must consider in making an override decision based upon the best interests of the United States." Gov't Br. at 24. The *Reilly* factors, however, simply represent a distillation of factors that the court would expect the federal agency decision-maker to consider before determining that an override either is "in the best interests of the United States" or "urgent and compelling." 31 U.S.C. § 3553(d)(3)(C)(i).

9

### D. Whether The November 22, 2011 Override Was Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law.

#### 1. Plaintiff's Argument.

URS argues that Treasury's November 22, 2011 override was motivated not by the "best interests of the government," but to save money, by having VSE perform under the October 28, 2011 Contract price, instead of the higher bridge contract price. Pl. Br. at 2, 19, 37. Treasury, however, didn't mention this fact in the D&F. *Id.* at 19-20. An interest in saving money, however, is not sufficient grounds to justify an override. *Id.* at 37 (citing *Reilly's Wholesale*, 73 Fed. Cl. at 727). Moreover, the Government's savings argument is inconsistent with the fact that Treasury took 22-months before it finally issued the Contract to the incumbent. *Id.* at 5, 7-9.

In addition, the D&F is arbitrary and capricious, because it fails adequately to address the *Reilly* factors. Pl. Br. at 20-25. First, Treasury failed to show any adverse consequences of allowing the automatic stay to take effect. Neither did the D&F address how a stay of the Contract for "management" of seized property would lead to fewer seizures or harm to the public. *Id.* at 21. In addition, Treasury failed to consider any reasonable alternatives to the override, such as exercising the second option under Modification 007, requiring VSE to perform under the existing sole-source contract until November 31, 2011. *Id.* at 22. This would have allowed further time to negotiate a bridge contract. *Id.* If VSE had been unwilling to negotiate, Treasury could have imposed a letter contract under FAR 16.603-2(a).[8] Pl. Resp. at 6 n.7. In addition, although the D&F stated that it considered the "cost associated with GAO sustaining the protest" it never discussed what the specific costs were or how they compared to the costs of the override. Pl. Br. at 23-24 (citing AR at 8). Finally, the D&F never discusses the fourth *Reilly* factor, *i.e.*, "impact of the override on competition and the integrity of the procurement system." *Reilly's Wholesale*, 73 Fed. Cl. at 711.

---

[8] A letter contract allows the Government to "authorize[] [a] contractor to begin immediately . . . performing services." 48 C.F.R. § 16.603-1. FAR 16.603-2(a) states that:

> (a) A letter contract may be used when (1) the Government's interests demand that the contractor be given a binding commitment so that work can start immediately and (2) negotiating a definitive contract is not possible in sufficient time to meet the requirement. However, a letter contract should be as complete and definite as feasible under the circumstances.

48 C.F.R. § 16.603-2(a).

### 2.  The Government's Argument.

The Government argues that the court should consider cost as a reason to justify the override, even though cost was not discussed in the D&F that was submitted to the HCA for approval.  Gov't Br. at 29-31.  The Government explains this oversight by the CO as "assum[ing] a certain level of familiarity in its readers with the background events surrounding the procurement at issue" and "[f]or ease of presentation to high-level decisionmakers."  Gov't Br. at 15.  In fact, Treasury calculated that it would save $[redacted] million per month by having VSE perform under the Contract, rather than under a bridge contract.  AR 13, 20.  Consideration of this factor by the CO, as reflected in the November 14, 2011 Draft D&F and November 22, 2011 Supporting Memorandum, is relevant for the court to consider, because "the question of the rationality of an agency's decision must be evaluated in light of the record *as a whole*."  Gov't Br. at 30.  Furthermore, it is appropriate for Treasury to consider the possibility of "economic waste" in authorizing the override, because an agency is supposed to consider the "potential costs to the [G]overnment from carrying out relief measures as may be recommended by the Comptroller General if the protest is subsequently sustained."  *PMTech, Inc.* v. *United States*, 95 Fed. Cl. 330, 346 (2010).

Nevertheless, Treasury's decision-making was well-reasoned.  Gov't Br. at  32-36.  The agency concluded that without an override, it would be without storage services for at least [redacted] weeks, based on its experience with negotiating bridge contracts.  Gov't Br. at 35 (citing AR 20, 26).  Moreover, VSE might have been unwilling to enter into a bridge contract. *Id.*  If not, [redacted] week gap in services would result in risks to the public from inadequate storage of items such as fighter jets (AR 203-204), lethal explosives (AR 10, 18, 24), cocaine (AR 9-10, 17, 23-24, 187, 207-08), and contaminated foods, including 28,522 contaminated lobsters (AR 9, 17, 23).  Therefore, Treasury reasonably determined that it could not adequately protect these items for [redacted] weeks without outside assistance.  AR 6.  Finally, Treasury considered the long-term risk to the criminal justice system of diverting resources from law enforcement to guard the seized property.  AR 12, 19, 25.  In addition, other problems might arise such as lost evidence, failed prosecutions, and potentially substantial government liability under the Federal Torts Claims Act.  AR 12, 19, 26.

### 3.  Intervenor's Argument.

VSE also argues that the existing bridge contract expired and it would take [redacted] weeks to finalize another contract.  Int. Br. at 11-12.  Therefore, Treasury reasonably concluded that the risks from a [redacted]-week gap in service, as well as the financial costs of securing performance under a bridge contract, justified an override as being in the "best interests of the Government.  Int. Br. at 12 (quoting AR 13).  If the court invalidates the override, Treasury will be confronted with termination costs under the October 28, 2011 Contract with VSE.  Int. Br. at 13.

VSE also contends that Treasury *did* consider the fourth *Reilly* factor, *i.e.*, the cost to the integrity of the procurement system of an override.  Int. Br. at 14-18.  In the November 22, 2011 Supporting Memorandum, the CO stated that "[t]he override creates no impact on competition [or] the integrity of the procurement system[.]"  AR 13.  Plaintiff's argument that allowing VSE to perform under the October 28, 2011 Contract improves VSE's competitive position entails "too many contingencies," because it assumes that: (1) the GAO protest will be sustained; (2) GAO will recommend re-competing the Contract; (3) Treasury will not recomplete the Contract, because of concerns about termination costs; and (4) another competition ultimately would lead to URS being awarded the Contract.  Int. Br. at 16.

### 4.  The Court's Resolution.

Congress requires that, before an override of the automatic stay is authorized, the "head of the procuring activity" must find, in writing, that an override is "in the best interests of the United States" or otherwise justified by "urgent and compelling circumstances that significantly affect interests of the United States."  31 U.S.C. § 3553(d)(3)(C).  As previously discussed, the automatic stay was intended to be "a strong enforcement mechanism" to protect the integrity of the procurement process, that previously was threatened by a widespread agency disregard of GAO recommendations and an unwillingness to revisit contracts already awarded.  *See* H.R. Cong. Rep. No. 98-861 at 1435 (1984).  To emphasize the importance of an override, Congress prohibited designated agency officials from delegating that decision.  *See* 31 U.S.C. § 3553(e).  In addition, even if that official determines that an override is in the "best interests of the United States" an analysis of the alternatives to the override and costs to the integrity of the procurement system must be conducted.  *See Reilly's Wholesale*, 73 Fed. Cl. at 711.  As one commentator has observed:

> [T]he "urgent and compelling interests" exception should be used in preference to the "best interests" rationale. Although at first glance the "best interests" justification would seem preferable[,] because it is easier to satisfy[:] this simplicity is illusory. The brevity of the "best interests" exception can lead a contracting activity into a false sense of security, causing them to draft an oversimplified determination that does not adequately explain the "best interests" that are to be served by the override. Such an inadequate explanation of best interests would not withstand judicial scrutiny in the event a protester sought an injunction. Furthermore, when an agency uses the "best interests" exception, CICA directs the GAO in fashioning a remedy to disregard "cost or disruption from terminating, recompeting, or rewarding the contract."

Judith A. Sukol, *The Competition In Contracting Act's Automatic Stay Provision and Judicial Review: A Trap for the Unwary*, 43 Admin. L. Rev. 439, 453 (1991).

In this case, the Administrative Record shows that Treasury gave no serious consideration to two of the *Reilly* factors.

First, the Administrative Record evidences that Treasury did not consider any alternatives to an override. Inexplicably, no attempt was made to exercise the option under Modification 007 to continue VSE's performance through November 31, 2011. In fact, the Government's brief studiously ignores this possibility, presumably because the agency's failure to consider it was indefensible. The Administrative Record also does not evidence any effort even to discuss the possibility of a new bridge contract with VSE, prior to issuing the override. In light of the fact that VSE had been operating under a sole source contract for over a year, it is difficult to believe that a temporary extension thereof could not have been effected without much effort. Therefore, Treasury's unsupported conclusion in the November 14 draft D&F that "a bridge contract would leave the government without services for at least [redacted] weeks while a sole source award is being procured" (AR 20) is arbitrary and capricious, because it "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, [and] is so implausible that it [can] not be ascribed to . . . the product of agency expertise." *State Farm,* 463 U.S. at 43. For the court to sanction such "reasoning" would undermine the "strong enforcement mechanism" of the automatic stay.

Second, Treasury made no serious attempt to analyze the effect of the override on the integrity of the procurement system. Instead, the Supporting Memorandum (which the HCA never even saw) simply asserts, with no support, that no such harm will occur. AR 13. Moreover, this *ipse dixit*, is belied by the parties' behavior. VSE forcefully has argued that Treasury's override should be upheld. *See generally* Int. Br.; Int. Resp. But even the Government concedes that VSE stood to *gain* financially from a bridge contract, that would entail a much higher price than the Contract. Gov't Resp. at 7 ("VSE is the incumbent and would be performing any bridge contract, only at greater remuneration. . . . URS is advocating in favor of an arrangement that would *enrich its competitor.*"). Obviously, VSE had something more valuable to gain from the override. Therefore, Treasury's cursory conclusion that VSE would not achieve a significant competitive advantage is not supported by the Administrative Record and must be considered a failure to "consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

Finally, the court is troubled by the cavalier assertion that the CO's decision to exclude any mention of cost in a decision-making document presented to the HCA for approval was appropriate for "ease of presentation." Gov't Br. at 15. If cost was deemed so unimportant that it need not be raised with the ultimate decision-maker, the court should not be expected to rely on this factor as the reason to support the agency's override.

## IV.     CONCLUSION.

For these reasons, the court has determined that Treasury's November 22, 2011 override of the automatic stay, authorized by 31 U.S.C. § 3553, was arbitrary, capricious, and an abuse of agency discretion.  Accordingly, the court will enter judgment for plaintiff declaring that the November 22, 2011 override is set aside, void, and without effect.  By operation of law, the automatic stay in bid protests numbers B-406140.1 and B-406140.2 are reinstated.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**